IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 13-61576-CIV

**UNITED STATES OF AMERICA,**

        Plaintiff,

and

**DISABILITY RIGHTS FLORIDA , INC.**,

d/b/a Disability Rights Florida , a Florida

non-profit corporation;

        Plaintiff in Intervention,

**v.**

**THE STATE OF FLORIDA**,

        Defendant.

_____/

**DISABILITY RIGHTS FLORIDA'S
COMPLAINT IN INTERVENTION**

    COMES NOW Plaintiff-Intervenor, DISABILITY RIGHTS FLORIDA , INC., d/b/a Disability Rights Florida , Inc. ("DISABILITY RIGHTS FLORIDA"), by and through their undersigned counsel, to file this Complaint in Intervention.  DISABILITY RIGHTS FLORIDA sues the Defendant, the State of Florida ( "DEFENDANT").

**PRELIMINARY STATEMENT**

1. Approximately two hundred children with medically complex needs in Florida are illegally segregated in nursing facilities throughout the state.  Due to the Defendant's failure to properly assess, plan for or provide appropriate community-based services, many of these children have spent most, if not all, of their lives institutionalized and

1

isolated from their communities and families.   Such isolation results in a denial of these children's rights to grow up with their peers, establish meaningful relationships with family and experience many of the opportunities afforded to their peers that don't have disabilities.

2. In addition to the institutionalized children, there are other children with significant complex  medical conditions who do reside in the community but are at risk of institutionalization or reinstitutionalization because of Defendant's practices of limiting community-based services, making it nearly impossible for them to remain in a community setting.

3. Defendant's practices of limiting funds and improperly administering services for children with complex medical needs have resulted in the unnecessary institutionalization of such children or have placed them at risk of institutionalization, discriminating against them in violation of title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12131-12134.  The ADA requires that public entities "administer services programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d); *see also* 42 U.S.C. § 12132; *Olmstead v. L.C.*, 527 U.S. 581, 596-97 (1999).  Moreover, *Olmstead* requires that public entities must provide community based services when (a) such services are appropriate, (b) the affected persons do not oppose community based treatment, and (c) community based services can be reasonable accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities. *Id.* at 607.

4. The United States of America filed an action against the State, seeking a declaratory relief finding that the Defendant's failure to provide integrated community services violates the ADA.  The United States also requests permanent injunctive relief requiring the Defendant to stop segregating medically fragile children in nursing facilities and to provide these children medically necessary Medicaid services in the most integrated community setting appropriate.  (Compl. P. 22)

5. Disability Rights Florida files this Complaint in Intervention against Defendant to remedy and enjoin segregation and institutionalization on the basis of disability in Florida nursing facilities in violation of the ADA.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, as it involves claims arising under federal law. *See* 42 U.S.C. § 12133. The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201-02.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391 as a substantial part of the acts and omissions giving rise to this action occurred in the Southern District of Florida. 28 U.S.C. § 1391(b).

8. Disability Rights Florida is authorized to intervene in this action pursuant to Fed. R. Civ. P. 24(a) and 24(b).

9. Adding Disability Rights Florida as a Plaintiff-Intervenor will not affect venue or jurisdiction.

**PARTIES**

10. Plaintiff-Intervenor, Disability Rights Florida, formerly known as the "Advocacy Center for Persons with Disabilities, Inc.," is Florida's federally funded protection and advocacy system. Disability Rights Florida is authorized by federal law to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals within the State who are or who may be eligible for treatment, services, or habilitation, or who are being considered for a change in living arrangements." 42 U.S.C. § 15043(a)(2)(A)(i).

11. Disability Rights Florida has a uniquely relevant interest in the subject matter of this action as the system statutorily enabled to pursue remedies on behalf of individuals with disabilities. *See* 42 U.S.C. § 15043(a)(2)(A)(i).

12. Disability Rights Florida has standing to assert claims on behalf of its constituents via intervention in this lawsuit, as its constituents are made up of Medicaid eligible children with complex medical conditions in need of Defendant's provision of Medicaid nursing services.

13. The constituents of Disability Rights Florida, Medicaid eligible children in need of nursing services, suffer the distinct and palpable injury of being unnecessarily institutionalized (or face the threat of institutionalization) due to the denial of the

3

    Medicaid services they require to live at home or in their communities.

14. This unnecessary institutionalization is due to Defendant's failure to provide medically necessary services.

15. The interest Disability Rights Florida seeks to protect is germane to the organization's purpose. As referenced in the Introduction, Disability Rights Florida, pursuant to 42 U.S.C. § 15043(a)(2)(A)(i) has the authority to pursue remedies for its constituents—including Medicaid eligible children residing in Florida nursing facilities. As part of its Long Range Plan, as outlined by the Disability Rights Florida Board of Directors for the period from 2013-2017, Disability Rights Florida seeks to:
    a. Strengthen our impact on the quality and availability of services and supports for individuals with disabilities.
        i. Identify *systemic weaknesses* impacting individuals with disabilities.
        ii. Develop and execute strategies to *remedy weaknesses in the system*.
        iii. Enhance opportunities for full participation in the community by people with disabilities.

16. In *Olmstead v. L.C.* 527 U.S. 581 (1999), the Supreme Court held that unjustified institutionalization of people with disabilities is a form of unlawful discrimination. *Olmstead* aligns with Disability Rights Florida's mission, "To advance the quality of life, dignity, equality, self-determination, and freedom of choice of persons with disabilities through collaboration, education, advocacy, as well as legal and legislative strategies." Aiding Medicaid eligible children in seeking provision of appropriate medically necessary services thereby enabling community placement is germane to Disability Rights Florida organizational purpose.

17. Disability Rights Florida's claim and relief do not require participation of individuals as the requested remedies in this case are injunctive and declarative based upon Disability Rights Florida's investigation of Defendant's acts and omissions in regard to constituents residing in nursing homes and those seeking to maintain their ability to continue living in their community homes.

18. Defendant, the State of Florida, is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), and is subject to title II of the ADA, 42 U.S.C. § 12131 *et seq*., and its implementing regulations, 28 C.F.R. Part 35.

19. Florida's Agency for Health Care Administration ("AHCA"), administers the State's Medicaid Program under Title XIX of the Social Security Act.  *See* Fla. Stat. §§ 20.42, 409.902.
20. Florida's Agency for Persons with Disabilities ("APD"), administers the State's Home and Community-Based Services ("HCBS") waiver programs for individuals with developmental disabilities.  *See* Fla. Stat. § 20.197.
21. Florida's Department of Health ("DOH"), administers a number of other HCBS waiver programs for individuals with traumatic brain injuries or other specific diagnoses.  *See generally* Fla. Admin. Code R. 59G-13.
22. Florida's Children's Medical Services Program ("FLCMS"), is responsible for arranging for long-term care services for children with certain special health care needs, *See* Fla. Stat. §§ 20.43, 391.016, 391.021(2), 391.026.
23. Florida's Department of Children and Families ("DCF"), administers the foster care system. *See*  Fla. Stat. §§ 20.19, 409.145.

**FACTUAL ALLEGATIONS**

24. Approximately two hundred children with complex medical needs in Florida are illegally segregated in nursing facilities throughout the state.  Additionally, those children with such needs  living in community or home settings are at risk of institutionalization or reinistitutionalization as a result of Defendant's flawed practices
25. The ADA requires that public entities "administer services programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also* 42 U.S.C. § 12132; *Olmstead v. L.C.*, 527 U.S. 581, 596-97 (1999).  *Olmstead* mandates that public entities must provide community based services when (a) such services are appropriate, (b) the affected persons do not oppose community based treatment, and (c) community based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities. *Id.* at 607.
26. Defendant's practices of limiting funds and services for children with complex medical needs have resulted in the unnecessary institutionalization  of such children or have

placed them at risk of institutionalization and discriminates against them in violation of title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12131-12134.

27. The Nursing Home Reform Amendments of 1987 to the Medicaid Act, 42 U.S.C. § 1396r(e) ("NHRA"), are part of a comprehensive remedial statute designed to address the widespread problem of warehousing people with developmental disabilities in the nation's nursing facilities. Congress enacted the Pre-Admission Screening and Resident Review ("PASRR") provisions of the NHRA to prevent and remedy the unnecessary admission and confinement of people with psychiatric and developmental disabilities in nursing facilities. *See* 42 U.S.C. § 1396r(e).

28. Defendants' failure to properly administer and oversee admission and transition processes exacerbates the unnecessary institutionalization of these children and further violates the law. Such processes are supposed to be conducted using the PASRR for all Medicaid certified nursing facilities. 42 U.S.C. § 1396r(e)(7); 42 C.F.R. §§ 483.100 to 483.138.

29. Under federal Medicaid law, the State is required to screen incoming nursing facility patients for mental illness and mental retardation, determine whether placement in a nursing facility is appropriate and if specialized services are needed, and to provide the specialized services that are necessary. *See* 42 U.S.C. § 1396r(e)(7).

30. The Children's Multidisciplinary Assessment Team (CMAT)—which is comprised of representatives from CMS, AHCA, and the DCF Community Based Care program—is responsible for conducting PASRRs in Florida.

31. There are two levels of PASRR screening and review – Level I and Level II. *See* 42 C.F.R. § 483.128(a).

a. The Level I screen determines whether individuals being considered for admission to a nursing facility have a developmental disability.

(1) For those persons whose Level I screen indicates the existence of a developmental disability, a Level II review is performed. This includes an assessment and evaluation to determine:

    (a) If they do, in fact, have a mental illness or developmental disability;

    (b) Whether they satisfy the nursing facility level of care criteria;

  (c) Whether their needs could be met in the community through the provision appropriate supports and services; and

  (d) Whether they could benefit from the provision of specialized services designed to maximize their ability for self-determination and independence.42 C.F.R. §§ 483.128(a) & 483.132.

32. A Level II PASRR review must include a psychosocial evaluation that analyzes current living arrangements and medical and social supports

 a. The review must also include a functional assessment of the individual's ability to engage in activities of daily living and must document the level of support that would be needed to assist the individual to perform these activities while living in the community. *See* 42 C.F.R. § 483.134(b)(5).

  (1) The assessment must determine whether it would be possible to meet the individual's needs through the provision of services and supports in the community as an alternative to nursing facility placement.

33. Defendant's failures to administer proper screening processes and provide options for appropriate community settings were evident in the work conducted by Clinical Nurse Consultant Karen Green McGowan, RN, CDDN, who investigated and reported on 22 individuals seen in three Florida facilities in October, 2012.

34. Of the 22 children reviewed, all but five should have been considered candidates for community placement, with one of those five beginning to show a pattern of stability that may allow her to be placed in a home care situation with adequate supports in the next year or so.

35. The PASRR process found in the records of these individuals was seriously deficient. For the most part, persons completing PASRR Level I did not seem familiar with developmental disabilities. Very few of the children were even referred for a PASRR Level II. The status of these children changes over time and requires reexamination which was not evident in the records. At least two children evaluated by the consultant were rated at a Level II on the Los Amigos Coma Scale at the time of their PASRR review, but had notably increased on the scale. However, their records reflected more significant limitations and suggest that they are very unresponsive. In one particular

7

case, even though the PASRR suggests the child is in a coma, the child was verbally responsive, walking with assistance and eating by himself.

36. A three year old child has been living at a Florida nursing facility since 2010 with Congenital Muscular Dystrophy and is classified as a medically fragile child with diagnoses including respiratory distress syndrome, GERD, nissen fundoplication, heart murmur, and nemaline rod myopathy. She is on a gastrostomy tube and is part time ventilator dependent, being taken off her ventilator for about an hour at a time up to three times per day. According to her Occupational Therapist, ". . . looks like she could do more." PASRR Level I screening was done pre-admission when she was just 16 months old, but the assessment was completed by an unqualified evaluator. A Level II PASRR evaluation form was in her chart but was blank.

37. A 13 year old child with Cerebral Palsy, seizure disorder, moderate persistent asthma, failure to thrive, myopia and strabismus, hypertonia and scoliosis is also residing at a Florida nursing facility. He has a gastrostomy tube and had a tracheostomy. He was admitted from a children's hospital after an incident of respiratory distress, but lived with foster parents prior to that. This child's PASRR Level I screening was completed on February 1, 2012, more than two years after he was admitted to the facility and a superficial Level II PASRR evaluation was performed, but not in a timely manner, occurring three months after referral. The PASRR Level II screening neglected to reference community options even though he previously lived in a Medical Foster Care situation and could do so again.

38. A four year old child who was born prematurely with Patent Ductus Arteriosus, a congenital heart disorder, and pulmonary hypertension also resides in a Florida nursing facility. He is a medically fragile child, admitted to the facility at 8 months of age, and has a gastrostomy tube as a result of his GERD and a tracheostomy as a result of his respiratory issues. He is young, interactive and his evaluation states that he enjoys being around people, sitting in his bouncy seat in the hallway, and throwing things. According to the PASRR Level I, dated December 20, 2011, he is not in need of specialized services and the PASRR Level II screening was completed on January 31, 2012, resulting in only basic nursing and respiratory therapy for him. His records did not contain PASRR screens from his original admission. His family is prepared to take on the responsibility

of his disability and the consultant recommended that he be placed either in his own home with appropriate support or in Medical Foster Care.

39. A 10 year old boy who suffered from a SIDS event resulting in anoxic brain damage at an early age and intractable epilepsy was admitted to a Florida nursing facility in 2005. He is a medically fragile child who has a gastrostomy tube as a result of his GERD. His evaluation states that his last hospitalization was in March of 2009 and it appears his health has been stable since then. This child's PASRR Level I contains conflicting information concerning his diagnosis of developmental disabilities and a PASRR Level II screening was never completed. The consultant recommended that he be placed in Medical Foster Care because he is very young and would benefit from a more family-like setting.

40. A 17 year old boy, who was a victim of shaken baby syndrome, resulting in compression of his brain through a traumatic brain injury, has resided at a Florida nursing facility since 2001, however there is no record of a Level I PASRR screen until December 20, 2011. The PASRR Level II screening was completed on January 17, 2012, stating that he had no need for specialized services due to his severe level of impairment. However, there is no indication that the person completing this review had the necessary qualifications or used appropriate criteria to come to this conclusion. The analysis used by the consultant indicated that he does not require a 24-hour nursing care setting and would be appropriate for a residential setting of 2-3 persons with access to professional nursing oversight and staff trained in physical and nutritional management.

41. A 9 year old boy with cerebral palsy and developmental delay, likely due to his premature birth, has resided at a Florida nursing facility since 2004. He also suffers from a history of meningitis, seizures, hydrocephalus treated with ventricular taps, and GERD. This child never received a Level I PASRR screen or a Level II PASRR screen. He receives only basic nursing care and respiratory therapy at the facility though a medical foster care situation with access to on-call medical support would meet his needs.

42. Children living in community or home settings are at risk of institutionalization or reinistitutionalization as a result of Defendant's flawed practices.

43. Disability Rights Florida's constituents include Medicaid eligible children receiving and in need of private duty nursing through Defendant's Medicaid state plan. These

constituents utilize Disability Rights Florida's legal services to appeal reductions, terminations and denials in their home health services. Disability Rights Florida has and continues to represent these constituents in administrative hearings, advocacy efforts, and self-advocacy education.

44. Defendant provides home health nursing to Medicaid eligible children who by definition have chronic debilitating diseases of one or more physiological or organ systems that make the person dependent upon twenty-four (24) hour per day medical, nursing, or health supervision or intervention. Fla. Admin. Code R. 59G-1.010(164)

45. Defendant conducts continued stay utilization reviews of nursing services every six months for children who, by Defendant's own definition, have chronic debilitating conditions that require continual care. Defendant's practices requires the parents provide substantial documentation for the services at a greater rate of frequency than they do of nursing homes providing care to the same category of children. Defendant places a higher burden on those seeking continuous community based nursing services than it does for those seeking continuous facility based services.

46. Defendant's review criteria require requests for private duty nursing services to consider the parents or legal guardians care of a recipient.

47. Defendant's review criteria requires the contracted prior authorization reviewer to "utilize guidelines approved by AHCA for reviewing the parent or legal guardian responsibility in providing care for the recipient."

48. In conjunction with the same, the Defendant's nursing program lists exclusions as: respite care, baby-sitting, social services, escort services, day care or after school care, companion sitting or leisure activities.

49. Such policies preclude the provision of nursing services beyond the time it takes to complete a designated nursing task such that parents are unable to work, attend school, shop for groceries, take other dependents in the home to appointments, general home maintenance, or "periodic relief to attend to personal matters unrelated to the medically necessary care of the recipient." Without a compilation of nursing tasks estimated to take 40 hours per week to complete, caregivers are unable to work full time without the provision of Medicaid waiver services.

50. Defendant has recently prohibited reductions in subsequent medical necessity utilization reviews unless there is a (1) factual error or omission in prior certifications, (2) improvement in the child's medical condition, or (3) change in circumstances. Yet, Defendant still requires parents/guardians of these children to submit all the required documentation for an initial request each and every six months even though the requested documents go beyond the information needed for the three criteria for a reduction.

51. Additionally, despite the allegedly narrowing reasons for reduction, the Defendant recently imposed new steps for parents/guardians to comply with including an Enhanced Care Coordination program. Every month the parents will need to communicate with the Defendant's agent about the child's condition. Every six months, the parents/guardians must now attend an in-person meeting with Defendant's medical professionals, often requiring parents/guardians to take an absence from work/school. At the meeting, the Defendant's agent and medical professionals develop their own service plan for the child's medical needs despite requiring the child's treating physician to do the same. Prior to this meeting, the provider of the nursing services must submit each and every previously required document including but not limited to: a summary of the child's current health status and diagnoses; nursing assessment; plan of care signed by the child's treating physician; patient condition summaries that substantiate the service including nurse progress notes; copy of the physician's order for the services; and documentation proving the child has been examined every six months. Most of these documents require the parents/guardians to complete or attend to thereby taking more time from the parents/guardians that are trying to maintain their child at home.

52. The Florida Legislature passed an appropriation that would have included monies to fund a rate increase for home health services provided by Licensed Practical Nurses and Registered Nurses but was vetoed by the Governor.

53. Children with chronic debilitating conditions often cannot be left unattended and therefore during hours in which no skilled intervention is required, an employed parent or one who attends school must rely on Defendant's waiver programs to provide respite/day-care/after-school care services.

54. The Florida Legislature authorized Florida's Agency for Health Care Administration and Agency for Persons with Disabilities to transfer funds from the specific appropriation for

nursing home care to the Medicaid waiver for persons with developmental disabilities. This would allow children in nursing homes to receive services in the community through the designated Medicaid waiver programs. No such budget transfer request has been made pursuant to this authority.

55. D.T., a Disability Rights Florida constituent, sustained a closed head injury at the age of 15. After his injury he resided with his father and received in-home nursing services. D.T. utilized a ventilator and received suctioning, nebulizer, and range of motion treatment at home. Defendant sought to reduce D.T.'s nursing services in 2010. While D.T. appealed the decision, his father was unable to maintain him at home and D.T. now resides in a nursing facility. D.T.'s father was unable to transport D.T. to therapies and his nurses often failed to show.

## **CLAIM FOR RELIEF**

56. The allegations of Paragraphs 1 through 55 are hereby re-alleged and incorporated by reference.

57. Defendant's practices of limiting funds and improperly administering services for children with complex medical needs have resulted in the unnecessary institutionalization of such children or have placed them at risk of institutionalization and constitute discrimination in violation of title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12131-12134.

58. Defendant is a public entity subject to title II of ADA, 42 U.S.C. § 12131(1).

59. The children with medically complex needs at issue in this Complaint in Intervention are qualified persons with disabilities and are covered by title II of the ADA, 42 U.S.C. §§ 12102, 12131(2).

60. Services in less restrictive settings for these children are appropriate, the affected persons do not oppose community based treatment, and community based services can be reasonable accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities. *See Olmstead v. L.C.*, 527 U.S. 581, 607 (1999).

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff DISABILITY RIGHTS FLORIDA   prays that the Court:

A. Issue a declaratory judgment declaring that Defendant has violated title II of the ADA by failing to provide services to children with medically complex needs in the least restrictive setting possible.
B. Issue an injunction that requires that Defendant provide services to children with medically complex needs in the least restrictive setting possible;
C. Award reasonable attorneys' fees, costs, and expenses to Disability Rights Florida.
D. Order such appropriate relief as the interest of justice may require.

DATE:  09/05/2013                         Submitted,

**Disability Rights Florida , Inc.**
BY: _____

David A. Boyer
Florida Bar No. 90917
*DavidB@DisabilityRightsFlorida.org*
1930 Harrison Street, Suite 104
Hollywood, Florida 33020-7050
Phone: (850) 488-9071
Fax:    (850) 488-8640

Amanda Heystek
Florida Bar No. 285020
AmandaH@DisabilityRightsFlorida.org
1000 N. Ashley Dr., Suite 640
Tampa, FL  33602
Phone: (850) 488-9071
Fax:    (850) 488-8640

Molly Paris
Florida Bar No. 90486
MollyP@DisabilityRightsFlorida.org
1930 Harrison Street, Suite 104
Hollywood, Florida 33020-7050
Phone: (850) 488-9071
Fax:    (850) 488-8640

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was furnished by US Mail, facsimile, and CM/ECF this 5th day of September, 2013 to the following:

Travis W. England
Beth A. Esposito
H. Justin Park
Joy Levin Welan
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW –NYA
Washington, D.C.  20530
O: 202-307-0663; F: 202-307-1197
Email: travis.england@usdoj.gov

Veronica Harrell-James
Assistant United States Attorney
99 N.E. 4th St.
Miami, FL 33132
O: 305-961-9327; F: 305-530-7139
Email: veronica.harrell-james@usdoj.gov

Stuart F. Williams
Leslei G. Street
Andrew T. Sheeran
Agency for Health Care Administration
2727 Mahan Dr., MS #3
Tallahassee, FL 32308
O: 850-412-3630; F: 850-921-0158
Email:
Stuart.williams@ahca.myflorida.com
Leslei.street@ahca.myflorida.com
Andrew.sheeran@ahca.myflorida.com

George N. Meros, Jr.
Andy Bardos
Gray Robinson, P.A.
PO Box 11189
Tallahassee, FL  32302-3189
O: 850-577-9090; F: 850-577-3311
Email:
George.meros@gray-robinson.com
Andy.bardos@gray-robinson.com